UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

C. GENE HALL, an individual,
FINANCIAL PLANNING COUNSELORS,
INC., a Michigan corporation, and THE
HALL FAMILY TRUST DATED MARCH
26, 1985, a Florida trust,                                     Case No. 02-70625

    Plaintiffs,                                                  Honorable Patrick J. Duggan

v.

JEFFREY C. FUREST, an individual,
WILLIAM F. FUREST, JR., an individual,
and FUREST, FUREST SERVICES, INC.
d/b/a FIRST FINANCIAL SERVICES,
jointly and severally,

    Defendants.
_____/

## **OPINION**

On February 15, 2002, Plaintiffs filed a twelve-count complaint against Defendants arising out of a failed joint venture between the parties which would have allowed C. Gene Hall, an insurance agent, to transfer his current clients to Defendants and retire. The following claims remain against the Furest Defendants: (I) Breach of Contract; (II) Promissory Estoppel; (III) Breach of Fiduciary Duties; (IV) Accounting; (V) Fraud and

Negligent Misrepresentation; and (VI) Tortious Interference.[1]  Presently before the Court is Defendants' Motion for Summary Judgment.  The Court heard oral arguments on these motions on August 14, 2006.

**I.    Background**

A.    The Parties

In 1998, Plaintiff Hall was a Florida resident and insurance agent who sold both life insurance and securities products.  Hall also offered financial planning services to clients in Michigan, Florida, and other states through Plaintiff Financial Planning Counselors ("FPC"), whose stock is owned entirely by the Hall Trust.  The majority of Hall's life insurance sales were through Jefferson Pilot Financial Insurance Company ("JPF") or Jefferson Pilot Securities Company ("JPSC").

Defendants Jeffrey C. Furest and William F. Furest, Jr. are Michigan residents and insurance agents who sell both life insurance and securities products in association with JPF and JPSC.  Their agency, First Financial Services ("FFS"), also offers financial planning services.

B.    The Negotiations

In 1998, Hall approached JPF Regional Vice President Frederick Kenny ("Kenny") to ask about other licensed insurance and securities agents affiliated with the JPF and

---

[1] In an Opinion and Order dated December 17, 2004, this Court dismissed Counts VII through XII of Plaintiffs' Complaint against all Defendants and dismissed former defendants in this action Jefferson Pilot Financial Insurance Company, Jefferson Pilot Securities Company, and Jefferson Pilot Financial's Vice President, Frederick Kenny, pursuant to a binding arbitration agreement contained in a settlement agreement.

JPSC who might be willing to represent Hall's clients in the future so that Hall could retire. Hall also sought to establish a retirement plan which would provide compensation to his wife and/or estate in the event of his disability or death. Kenny recommended that Hall meet with the Furests, who had recently implemented a similar succession plan.

By the spring of 1999, Hall and FFS had agreed to enter into a written agreement similar to that of the Furests'. Hall agreed to gradually transfer his clients to FFS and the Jefferson Pilot entities agreed to make special accommodations to facilitate the arrangement. For life insurance, JPF agreed to assign a "joint General Agent" code, which would allow Hall and the Furests to separately identify business written by them pursuant to their Agreements (as opposed to the parties' existing renewals as well as other business written by the Furests), and receive the appropriate commission. For securities, JPSC similarly agreed to utilize joint registered representative codes.

On May 3, 1999, Jeffrey Furest sent Hall a letter confirming FFS's understanding of the status of negotiations. (Defs.' Mot. for Summ. J. Ex. B). In the letter, Jeffrey Furest asked Hall to identify a corporate entity as a party to the upcoming Agreement with FFS and provide specific financial data so the parties could determine the actual securities value and book value which would be encompassed by their agreement.

C.  The Agreement

On June 10, 1999, the parties executed an agreement ("the Agreement"). (Defs.' Mot. for Summ. J. Ex. C). In the Agreement, Hall chose FPC as the entity to be governed and assigned a book value of $470,712 to FPC's corporate stock. Because the Hall Trust owned all of FPC's stock, only the Hall Trust and FFS were made parties to the

3

Agreement.

Hall and the Furests forwarded a General Agent Transfer Letter (Ex. D) to JPF and a Notification Letter (Ex. E) along with a copy of the Agreement to JPSC. The Jefferson Pilot entities declined to cosign the documents because they were not parties to the Agreement (*see* Ex. F), but implemented the plan.

Under the Agreement, Hall began to provide client information to FFS. However, a number of administrative mistakes arose, such as coding and division of commission problems. (*See* Ex. G).

D.   The Dispute and Separation

In 1999, JPSC adopted a new field supervisory structure called an "Office of Supervisory Jurisdiction" ("OSJ"). At the time, both Hall and Jeffrey Furest were registered securities agents and "branch managers" of their respective Florida and Michigan offices. Under the new structure, registered representatives such as Hall and the Furests were required to either become OSJs or report to a qualified OSJ to continue selling securities as a JPSC representative. (*See* Ex. H).

Under this new requirement, Jeffrey Furest qualified as an OSJ and undertook supervisory responsibilities for all registered representatives of FFS. Hall contends that Jeffrey Furest forged Hall's signatures in two sets of documents and surreptitiously submitted them to JPSC while Hall was in poor health and recovering from heart surgery: (1) a December 28, 2000 correspondence falsely reflecting Hall's decision to fall under Furest's OSJ supervision rather than qualifying on his own for OSJ status (*see* Ex. I); and

4

(2) Registered Representative Agreements from JPSC (*see* Ex. J).[2]  Hall alleges that Defendants then attempted to surrender existing insurance policies without the knowledge of Hall's clients and/or that Defendants sold policies to Hall's clients without sharing commissions.

Upon learning of Hall's forgery allegations against Jeffrey Furest, the Jefferson Pilot entities submitted the original documents for an independent forensic analysis, which verified the presence of Hall's original signatures and Hall's fingerprints on some of the documents.  (*See* Ex. M).

## II.   Defendants' Motion for Summary Judgment

A.   Standards of Review

Defendants seek judgment as a matter of law pursuant to Rule 12(b)(6), which tests the legal sufficiency of Plaintiffs' Complaint.  *See Scheid v. Fanny Farmer Candy Shops Inc.*, 859 F.2d 434, 436 n.1 (6th Cir. 1988).  When deciding the motion, "[t]he court must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claims that would entitle him to relief."  *Cline v. Rogers*, 87 F.3d 176, 179 (6th Cir. 1996).  "A judge may not grant a Rule 12(b)(6) motion based on a disbelief of a complaint's factual allegations."  *Columbia Natural Res., Inc. v. Tatum*, 58 F.3d 1101, 1109 (6th Cir. 1995).  "However, while liberal, this standard of review does

---

[2] Although in a letter from Hall to a representative from JPF, dated November 5, 2001, Hall wrote: "I did consent for my Branch Office to come under Jeffrey Furest's OSJ [Office of Supervisory Jurisdiction]" (Ex. K), it is clear from the remaining portions of the letter that Hall intended to write that he did *not* consent, but inadvertently omitted the word "not."

require more than the bare assertion of legal conclusions." *Id.*

Defendants also move for summary judgment pursuant to Rule 56. This Court will grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). No genuine issue of material fact exists for trial unless, by viewing the evidence in a light most favorable to the nonmoving party, a reasonable jury could return a verdict for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). The moving party bears the burden of informing this Court of the basis for its motion and identifying those portions of the record that establish the absence of a material issue of fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986).

Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to look beyond the pleadings and designate specific facts showing that a genuine issue exists for trial. FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 322-24, 106 S. Ct. at 2552-53. It is not enough that the nonmoving party comes forward with the "mere existence of a scintilla of evidence . . . ," *Anderson*, 477 U.S. at 252, 106 S. Ct. at 2512, or some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986). Rather, the nonmoving party must present significant probative evidence in support of its opposition to the motion for summary judgment. *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993).

B.   Applicable Law and Analysis

1.   Breach of Contract

In their Complaint, Plaintiffs allege that "on or about May 3, 1999 and thereafter" all Plaintiffs entered into a contract with all Defendants which would provide for, among other things, joint servicing of Hall's clients and a retirement package for Hall. (Compl. ¶40). Plaintiffs contend that Defendants "have breached their agreement with Plaintiffs by, among other things, failing to pay monies to Plaintiffs as required by said contract, misappropriating Plaintiffs' clients and attempting to prematurely trigger the Buy/Sell agreement." (Compl. ¶41).

At his deposition, Hall identified the existence of two contracts: (1) the May 3, 1999 letter from FFS (Defs.' Mot. for Summ. J. Ex. B); and 2) the June 10, 1999 Agreement (Ex. C). In their Motion, Defendants argue that the May 3, 1999 letter is not a contract. In addition, Defendants contend that although the June 10, 1999 Agreement is a contract, it was not breached. The Court will address each of these arguments separately.

a.   The May 3, 1999 Letter

The letter was written by Jeffrey Furest on behalf of FFS, to Hall, and provides, in part: "We are finally over all of the hurdles and can put our program in action. Per your request, this letter can be used as confirmation of the intent of our arrangement. The following is a summary of our relationship, responsibilities and duties." (Ex. B at 1). The letter then goes on to list the parties' relationship, responsibilities and duties.

Defendants argue that the letter fails as a contract pursuant to the Statute of Frauds. Mich. Comp. Laws Ann. § 566.132(1) provides, in part:

7

> In the following cases an agreement, contract, or promise is void ***unless that agreement***, contract, or promise, or a note or memorandum of the agreement, contract, or promise ***is in writing and signed with an authorized signature by the party to be charged with the agreement***, contract, or promise:
>
> (a) An agreement that, by its terms, is not to be performed within 1 year from the making of the agreement.

(Emphasis added).

In this case, the alleged agreement is a written letter signed by Jeffrey Furest on behalf of FFS. Therefore, the Court does not believe that the Statute of Frauds applies.

Defendant also argues that the letter is not a contract. Under Michigan law, the elements of a breach of contract claim are: (1) the existence of a contract between the parties, (2) the terms of the contract require performance of certain actions; (3) a party breached the contract, and (4) the breach caused the other party injury. *Webster v. Edward D. Jones & Co., L.P.*, 197 F.3d 815, 819 (6th Cir. 1999). In order to form a valid contract, there must be a "meeting of the minds" on all the material facts in the alleged agreement. *Fisk v. Fisk*, 328 Mich. 570, 574, 44 N.W.2d 184, 185 (1950). To determine whether there was a meeting of the minds, the court must look to the parties' express words and their visible acts, not their subjective states of mind. *Siegel v. Spinney*, 141 Mich. App. 346, 350, 367 N.W.2d 860, 862 (1985).

Applying these elements, the Court does not believe that Plaintiffs have shown that a meeting of the minds occurred in the May 3, 1999 letter. The letter specifically says,

> "To understand the arrangement between our firms, the following is a recap that Fred Kenny helped develop to keep things simple and straightforward, while simultaneously insuring that our various income programs will remain intact through the actual transition in the event of your death, disability, or elected retirement/withdrawal."

8

In this Court's opinion, this letter is a suggestion by Mr. Furest to Mr. Hall as to what provisions should be included in any final agreement.

Furthermore, the only "parties" mentioned in the letter are Hall and FFS. Hall did not sign the document or indicate his "acceptance" in any way. Furthermore, the letter does not "require performance of certain actions." Rather, the letter merely sets forth the joint coding methodology and suggests how Hall would be compensated. In fact, the letter specifically refers to "the agreement" and steps to be taken before Furest would be sending Hall a "final draft for signing." (Ex. B at 2).

Plaintiff argues that the letter is a contract to make a contract. "To be enforceable, a contract to enter into a future contract must specify all its material and essential terms and leave none to be agreed upon as the result of future negotiations." *Heritage v. Wilson*, 170 Mich. App. 812, 819 (1988). For example, in *Heritage*, the court found that a letter of intent which was signed by both parties constituted a "contract to make a contract" where:

> [T]he letter of intent identified the parties, the assets to be sold, the consideration, the schedule for payment, the handling of the accounts receivable the rights and remedies of each party upon breach, and mutual termination rights if the closing did not occur within 360 days of the definitive agreement. The definitive agreement would have added only the mechanics necessary to accomplish the conveyance.

*Id.*

In this case, however, the May 3, 1999 letter did not specify all material and essential terms, which would later be included in the Agreement. In fact, the letter instructs Hall that, "the only thing to do is for you to identify which corporate entity you

9

want to have the agreement with FFS, and establish the 1999 securities values for the agreement . . . You should also contact your CPA or tax advisor to secure the actual book value of your company . . . ." (Ex. B at 2). Thus, at the time the letter was written, Hall had not even chosen which corporate entity was to enter into the agreement with FFS, or specified a value. Therefore, the May 3, 1999 letter is not a contract or a contract to make a future contract.

    b.  <u>The June 10, 1999 Agreement</u>

Although Defendants acknowledge that the Agreement is a contract, they contend that, even viewing the evidence in the light most favorable to Plaintiffs, Plaintiffs have failed to establish that Defendants breached the Agreement. In fact, Plaintiffs' Complaint, in this Court's opinion, fails to allege a breach of the June 10, 1999 agreement.

All of Plaintiffs' allegations alleging a "breach of contract" are contained in Count I. Count I provides:

    40. On or about May 3, 1999 and thereafter, Hall, FPC, and the Hall Trust, entered into a contract with the Defendant Furest and FFS pursuant to which the parties agreed to enter into a Joint Venture or Partnership which would provide among other things, for the joint servicing of Plaintiffs' clients, and eventually, a retirement package for Hall.

    41. Said Defendants have breached their agreement with Plaintiffs by, among other things, failing to pay monies to Plaintiffs as required by said contract, misappropriating Plaintiffs' clients and *attempting* to prematurely trigger the Buy/Sell Agreement." (Emphasis added.)

Furthermore, Plaintiffs have produced no evidence to support their claim that the June

10

10, 1999 Agreement has been breached.

The Buy/Sell agreement provides:

I. PURPOSE

The purpose of this Agreement is to provide for the purchase by Purchaser of Stockholder's corporate interest . . . . Stockholder and Purchaser agree that such purchase and sale shall occur upon the death, disability, retirement or withdrawal of C. Gene Hall.

II. AGREEMENT TO BUY AND SELL UPON THE DEATH OF THE STOCKHOLDER

Upon the death of Gene Hall, the successor of the Hall Family Trust shall sell, and the Purchaser shall buy, all of the Stockholder's corporate stock. The price will equal the value as provided in this Agreement. The Stockholder shall provide such instruments as may be necessary to complete the sale and purchase hereunder. Any stock subsequently acquired by Stockholder shall likewise be subject to purchase and sale under the terms of this Agreement.

(Defs.' Mot. for Summ. J. Ex. C, Agreement at §§1-2).

At his deposition, Hall testified:

Q. Okay. Do you contend as you sit here today that the buy/sell agreement executed between yourself, your trust, and the First Financial Services agency was breached?

A. Not that I'm aware of at this point.

(Dfs. Reply, Ex. W, Hall Dep. at 1244.)

Furthermore, at the hearing on the motion for summary judgment on August 14, 2006, counsel for Plaintiffs acknowledged that although he believes that a "triggering event" occurred, and that Furest was responsible for such "triggering event," he acknowledges that Mr. Hall never advised Mr. Furest that a triggering event has occurred and that as a result, Mr. Furest owes Mr. Hall money (Tr. 8/14/06, p.13). When the Court further inquired of

11

counsel for Plaintiffs whether or not Mr. Hall ever advised Mr. Furest that one of the events referred into the Buy/Sell Agreement has been triggered, counsel responded, "It's part of our complaint."

However, even assuming that a "triggering event" occurred which might impose obligations on the part of Furest, Hall testified that Furest never approached Hall demanding that Hall sell him his shares after the Buy/Sell Agreement was triggered (Plaintiffs' Response, Ex. B, Hall Dep. at 254). There is absolutely no evidence in the record to support a claim by Plaintiffs that Hall intended that Furest should acquire his interest pursuant to the Buy/Sell Agreement. Furthermore, as counsel for Plaintiffs acknowledged at the hearing on August 14, 2006, he had no idea what amount Defendant may owe stating that, "The amount of money has to be determined based on the appraisal of what the business was at the time of the triggering event," and that, "That's never been done."

THE COURT: "How can you prove that he owes any money?"

MR. RAUSS: "He owes something."

For the reasons set forth above, the Court is satisfied that no genuine issue of fact exists with respect to Plaintiffs' right to recover damages for the alleged breach of the June 10, 1999 Agreement and the Court shall grant Defendants' motion for summary judgment with respect to this claim.

2. Promissory Estoppel

Defendants argue that Plaintiffs have failed to assert any specific or definite promises made by Defendants, besides those set forth in the Agreement.

"The elements of promissory estoppel are (1) a promise, (2) that the promisor should

reasonably have expected to induce action of a definite and substantial character on the part of the promisee, and (3) that in fact produced reliance or forbearance of that nature in circumstances such that the promise must be enforced if injustice is to be avoided." *Novak v. Nationwide Mut. Ins. Co.*, 235 Mich. App. 675, 686-87, 599 N.W.2d 546, 552 (1999). Promissory estoppel requires "an actual, clear, and definite promise." *Ypsilanti Twp. v. General Motors Corp.*, 201 Mich. App. 128, 134, 506 N.W.2d 556, 559 (1993) (citing *State Bank of Standish v. Curry*, 442 Mich. 76, 84-85, 500 N.W.2d 104, 108 (1993)). "A promise is a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made." State Bank of Standish, 442 Mich. at 85, 500 N.W.2d at 108.

Plaintiffs argue that even if the Court finds that the May 3, 1999 letter does not constitute a contract, promissory estoppel should apply to require Defendants to honor the promises contained in the May 3, 1999 letter. In this Court's opinion, the only sentence in the May 3, 1999 letter that could arguably constitute a "promise" to entitle Plaintiffs to relief on their promissory estoppel claim is the statement in the letter,

13
"The primary goal is to preserve your future income stream while simultaneously preserving your client relationships, which in turn preserves certain types of business providing the income. Through your efforts of personal client introduction to First Financial Services (FFS), we will be forgoing an association with your clients that represent your having an extended office to serve their financial interests."[3]

---

[3]This is the "promise" counsel for Plaintiffs identified at the hearing on August 14, 2006 (Tr. at    ).

Based on the present record, this Court is not prepared to conclude, as a matter of law, that this "statement" by Furest could not constitute a promise supporting Plaintiffs' claim of promissory estoppel. The Court is therefore denying Defendants' motion for summary judgment with respect to this specific issue. Plaintiffs, of course, will have to prove that such "promise" was relied upon by Plaintiffs, that such promise was not fulfilled by Defendants, and that Plaintiffs suffered damages based on their reliance on such promise.

3. Breach of Fiduciary Duties

Plaintiffs allege that Defendants breached their fiduciary duties to Plaintiffs because Furest "withheld or improperly split the agreed upon commissions, attempted to have Hall's position with JP terminated, and generally did everything and anything to take Hall's client base built from years of cultivation and hard work." (Pls.' Resp. at 13).

"A fiduciary relationship arises from the reposing of faith, confidence, and trust, and the reliance of one upon the judgment and advice of another." *Ulrich v. Fed. Land Bank*, 192 Mich. App. 194, 196, 480 N.W.2d 910, 911 (1991). "Relief is granted when such position of influence has been acquired and abused, or when confidence has been reposed and betrayed." *Vincencio v. Ramirez*, 211 Mich. App. 501, 508, 536 N.W.2d 280, 536 N.W.2d 280, 284 (1995).

Defendants argue that Plaintiffs have failed to establish the existence or breach of a fiduciary relationship. First, the Court agrees that Plaintiffs have failed to establish that Defendants acquired the requisite "position of influence" over Plaintiffs. Second, even assuming *arguendo* that a fiduciary relationship existed, the Court agrees that Plaintiffs have failed to point to any evidence in the record before the Court to support their claim that

14

Defendants breached their fiduciary duties. Plaintiffs have failed to show that Hall was paid improper commissions through any fault of Defendants; rather, administrative error on the part of the Jefferson Pilot entities was to blame. (*See* Defs.' Reply Ex. S). Moreover, as set forth above, Defendants contend that "numerous audits of commissions paid to Hall and FFS have verified Hall received *all* commissions he was entitled to." (Defs.' Reply at 2 (emphasis in original)). Therefore, summary judgment shall be granted as to Plaintiffs' Breach of Fiduciary Duties Claim (Count III).

    4. Accounting

In their Complaint, Plaintiffs assert a claim for equitable relief in which they seek "a complete list of all clients, all transactions involving all clients and all commissions received from said transactions" since May 3, 1999. Plaintiffs allege that Defendants have "refused to provide Plaintiffs with any information or documentation regarding the Joint Venture or Partnership and its operations . . . ." (Compl. ¶53).

In their Motion, Defendants contend that they have produced "[a]ll commission sheets for both Hall and Defendants Furest for the periods sought." (Defs.' Mot. for Summ. J. at 13). Defendants further contend that the Jefferson Pilot entities made these same documents available to Plaintiffs as part of the settlement agreements. (*Id.*).

In their Response, Plaintiffs contend that "[d]espite Defendants' assertions to the contrary, Plaintiffs have not received all information and documentation pertaining to these transactions during discovery." (Pls.' Resp. at 14). Plaintiffs have not indicated *why* they believe that they have not received all the documents that they requested during discovery, *which* documents they believe they are missing, or *what* information they expect such

15

documents to reveal. Therefore, summary judgment shall be granted as to Plaintiffs' Accounting Claim (Count IV).

### 5. Fraud and Negligent Misrepresentation

In their Complaint, Plaintiffs allege that Defendants made misrepresentations, or failed to disclose information, regarding their true intentions concerning the parties' Agreement (Compl. ¶55), and that Defendants falsified documents regarding the relationship of the parties (Compl. ¶56). In their Motion, Defendants argue that Plaintiffs' claims for fraud and negligent misrepresentation were not stated with sufficient particularity to satisfy Fed. R. Civ. P. 9(b) and that Plaintiffs have failed to establish the necessary elements of those claims.

The elements of fraud are: (1) the defendant made a material representation; (2) the representation was false; (3) at the time of making the representation, the defendant knew that it was false, or made it recklessly, without any knowledge of its truth, and as a positive assertion; ***(4) the defendant made it with the intention that it should be acted upon by plaintiff; (5) the plaintiff acted in reliance upon it;*** and (6) the plaintiff thereby suffered injury. *Hi-Way Motor Co. v. Int'l Harvester Co.*, 398 Mich. 330, 336, 247 N.W.2d 813, 816 (1976) (emphasis added).

Similarly, a claim for negligent misrepresentation "requires plaintiff to prove that ***a party justifiably relied*** to his detriment on the information prepared without reasonable care by one who owed the relying party a duty of care." *The Marble Cleary Trust v. The Edward-Marlah Muzyl Trust*, 262 Mich. App. 485, 502, 686 N.W.2d 770, 783 (2004) (internal quotation omitted) (emphasis added).

16

Moreover, Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). To satisfy the requirements of Rule 9(b), the Sixth Circuit "requir[es] a plaintiff, at a minimum, 'to allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud.'" *Coffey v. Foamex LP*, 2 F.3d 157, 161-62 (6th Cir. 1993) (quoting *Ballan v. Upjohn Co.*, 814 F. Supp. 1375, 1395 (W.D. Mich. 1992)). Reviewing the allegations in the Plaintiffs' Complaint, the Court must determine whether Plaintiffs allege each element of their fraud and misrepresentation claims with sufficient particularity.

In this case, Plaintiffs have not pled any act of fraud or misrepresentation with particularity nor have they established the elements necessary to support their fraud and negligent misrepresentation claims. Although Plaintiffs allege that Defendants "falsified documents regarding the relationship of the parties," (Compl. ¶56), Plaintiffs do not allege that Defendants intended that the forgery be acted upon by *Plaintiffs* or that *Plaintiffs* relied upon Defendants' alleged forgery. Therefore, Plaintiffs' fraud and negligent misrepresentations claims fail under both Rules 9(b) and 56(c) of the Federal Rules of Civil Procedure and Count V of Plaintiffs' Complaint shall be dismissed.

6. Tortious Interference

In their Complaint, Plaintiffs allege that "[b]y breaching their above-described fiduciary duties, unilaterally terminating [the Agreement] and attempting to seize control over Hall's business and clients, Defendants Furest and FFS have willfully and intentionally interfered with [Plaintiffs'] contracts and legitimate economic expectancies." (Compl. ¶63). The

17

Complaint also alleges that "Defendants acted maliciously and without justification, for the purpose and intent of interfering with Plaintiffs' contracts and economic expectancies." (Compl. ¶64).

The elements of tortious interference with a business relationship are: "(1) the existence of a valid business relation or expectancy, (2) knowledge of the relationship or expectancy on the part of the defendant, (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage." *Grand Rapids Plastics, Inc. v. Lakian*, 188 F.3d 401, 407 (6th Cir.1999) (citing *Michigan Podiatric Med. Ass'n v. Nat'l Foot Care Program, Inc.*, 175 Mich. App. 723, 735, 438 N.W.2d 349, 354 (1989)). To make out a claim for tortious interference with business relations, Plaintiff "'must allege the intentional doing of a per se wrongful act or the intentional doing of a lawful act with malice and unjustified in law for the purpose of invading [the plaintiff's] contractual rights or business relationship.'" *Chrysler Int'l Corp. v. Cherokee Export Co.*, 134 F.3d 738, 745 (6th Cir.1998) (quoting *Feldman v. Green*, 138 Mich. App. 360, 369, 360 N.W.2d 881, 886 (1984)).

In their Response, Plaintiffs argue that Defendants engaged in two per se wrongful or malicious acts that interfered with Plaintiffs' business expectancies: (1) Defendant Furest drafted a "change of agent" letter for Hall's clients, Mr. Battle and his wife, without Hall's knowledge; and (2) Defendant Furest falsely accused Hall of breaking securities laws and violating Jefferson Pilot policies, which resulted in the termination of Hall's contract with Jefferson Pilot.

The Court does not believe that Plaintiffs have demonstrated that Defendants engaged

18

in a per se wrongful act or acted maliciously. In *Feldman*, the Michigan Court of Appeals defined "malice" and "a wrongful act" as follows: "Malice in the legal sense is the intentional doing of a wrongful act without justification or excuse. And a 'wrongful act' is any act which in the ordinary course will infringe upon the rights of another to his damage, except it be done in the exercise of an equal or superior right." *Feldman*, 138 Mich. App. at 370 n.1, 360 N.W.2d at 887 n.1 (quotation omitted).

First, according to Jeffrey Furest, the Battles requested a change of agent of record letter so that Hall would not be involved in their insurance policies. (Defs.' Reply Ex. V, J. Furest Dep. at 400). Furest contends that he wrote the policy and tendered Hall 50% of the commission. (J. Furest Dep. at 401). Plaintiffs have not provided this Court with any evidence to contest Furest's assertion that the Battles did not want to work with Hall or that Hall did not receive his share of the commission from this transaction. Thus, Plaintiffs have not established the existence of a valid business relation or expectancy or that Defendants acted wrongfully or maliciously by writing the Battles' insurance policy.

Second, it was through Hall's own actions that JPSC terminated Hall's securities license. To establish a claim for tortious interference, Hall must prove that Defendants *induced* or *caused* a breach or termination of a relationship or expectancy. *Grand Rapids Plastics, Inc.*, 188 F.3d at 407. JPSC terminated Hall's ability to sell securities under its broker dealer license in February 2002 because Hall refused to accept the terms proposed by JPSC regarding the OSJ requirement. (*See* Defs.' Reply Ex. X, Boulter Dep. at 69).

Consequently, there is no evidence in the record before the Court that Defendants induced or caused a breach or termination of a relationship or expectancy, or that Defendants

19

acted wrongfully or maliciously. Therefore, summary judgment shall be granted as to Plaintiffs' Tortious Interference Claim (Count VI).

Accordingly,

**IT IS ORDERED** that Defendants' Motion for Summary Judgment is **GRANTED** as to all counts except Court II (Promissory Estoppel).

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment as to Count II (Promissory Estoppel) is **DENIED.**

                                                  PATRICK J. DUGGAN
                                                  UNITED STATES DISTRICT JUDGE

Copies to:
Dennis M. Rauss, Esq.
Thomas S. Michael, Esq.